[762 NYS2d 358]

ELBA SEPULVEDA et al., Appellants, v DAVID AVILES, Respondent.

First Department, June 19, 2003

APPEARANCES OF COUNSEL

*Richard J. Montelione* of counsel (*Montelione & Associates, P.C.,* attorneys), for appellants.

*Peter Carparelli* for respondent.

## OPINION OF THE COURT

GONZALEZ, J.

Plaintiffs Elba and Victor Sepulveda are the coexecutors of the estate of the decedent Agnes Seals, as well as beneficiaries under her will. In October 1998, they commenced the instant action against defendant David Aviles to set aside the 1994 conveyance of a building located at 306 East 119th Street (the building) from Seals to Aviles for $50,000, on the ground that it was procured through fraud and undue influence. Plaintiffs alleged that after a June 1994 fire in the building next door, requiring all residents to temporarily vacate the premises, Seals became mentally and physically unable to manage the property. Seals was diagnosed with severe Alzheimer's dementia and eventually died in January 1997, at the age of 83.

According to plaintiffs' complaint, Aviles, aware of Seals's infirmities, induced her to sell the building to him for inadequate consideration, or without the intent of paying the consideration, by fraudulently promising that he would allow her to live rent-free in the building and care for her for the rest of her life. The complaint further alleged that Aviles never paid the mortgage and fraudulently obtained over $39,000 from Seals by using her credit cards for his own purposes. Plaintiffs' equitable claim was tried before the court and a jury considered various factual issues and plaintiffs' claims for money damages.

The trial evidence established that Seals met Aviles for the first time at a local bank in June 1994, shortly after the fire in the building next door. At the time, Seals was 81 years old and Aviles was 35. Two social workers who worked with Seals testified that Seals told them that she had met a nice man at the bank, referring to Aviles, who had promised her that in exchange for the transfer of her building to him he would take care of her for the rest of her life.

Seals sold the building to Aviles on August 26, 1994 for a purchase price of $50,000, consisting of a $10,000 down payment and a $40,000 purchase-money mortgage. At the closing, Seals was represented by an attorney, Martin Freedman, who was referred to her by Aviles's attorney, who shared office space with Freedman. Freedman testified at trial that Seals had told

him that she wanted to sell the building because she could no longer manage it. To him, she appeared coherent, lucid and oriented at the closing. Freedman admitted that he did not advise Seals to obtain an appraisal on the property and did not prepare any documents protecting Seals's right to live at the premises, rent-free or otherwise, a subject he says was never discussed.

Although he had never seen the property, Freedman testified at his deposition that he did not believe the building was worth much because of the fire damage and because 6 of the 10 apartments were vacant.[1] Plaintiffs countered this assertion with the testimony of an expert real estate appraiser, who set a value, using a sales comparison approach, at $134,000-$167,000 if the property was in good condition, and $80,000-$100,000 if it was damaged from the fire at the adjacent building. However, the opinion of plaintiffs' expert was undermined on cross-examination when he conceded that his opinion was premised on a full rent roll, and by his admission that several larger buildings nearby had sold for less than $50,000.

Plaintiffs subpoenaed records from the bank where both Seals and Aviles had accounts and introduced testimony from a bank employee to establish that Aviles's mortgage payments were never deposited into Seals's account and Aviles had obtained additional money from her checking account. By comparing the routing numbers and endorsements on 10 checks drawn on Aviles's account with various bank accounts and deposit slips, the bank employee determined that these checks, purportedly mortgage payments payable to Seals, were redeposited back into Aviles's own account. Further evidence showed that, by October 1995, Aviles stopped making these mortgage "payments" altogether.

In addition, evidence was presented that three additional checks in the amount of $15,300, drawn on Seals's account and made payable to Seals or cash, were deposited into Aviles's account. Further, although plaintiffs were precluded from introducing Seals's credit card statements into evidence, Aviles admitted to the use of Seals's credit cards for approximately $30,000 in charges, although he disputed the amount owed.

Plaintiffs introduced evidence of Seals's impaired mental condition at the trial. In October 1996, the Department of

---

1. Although portions of Freedman's deposition testimony were read into the record, he eventually appeared and testified at the trial.

Social Services commenced a Mental Hygiene Law article 81 proceeding to declare Seals an incapacitated person and to appoint a guardian on her behalf. The court evaluator in that proceeding testified at the instant trial that, in her 1996 report to the article 81 court, she concluded that Seals was disoriented, was being financially exploited and needed a guardian. Her report was admitted into evidence.

Plaintiffs also called a psychiatrist with significant geriatric care experience, Dr. Howard Forster, who testified that he examined Seals in July 1996. Dr. Forster gave his opinion that at the time of the 1994 sale of the building, Seals was already suffering from severe Alzheimer's dementia, although not as severe as when he examined her in 1996. He further testified that a medical opinion can be rendered as to the onset of Alzheimer's disease because the condition is progressive and there is good and readily available data about its typical duration and progression. He explained that the disease has three different stages, mild, moderate and severe, it takes 5 to 7 years to progress to the severe stage and it does not proceed from onset to death in less than 3 or 4 years. Dr. Forster disagreed with the report of a Dr. Landau, who examined Seals in January 1996 and found that she suffered from only "mild" Alzheimer's dementia.[2]

Social worker Debra Blair testified that after her initial visit in December 1995, she saw Seals 3 or 4 times a week. Blair stated that Seals was totally homebound and dependent on others to do her banking and shopping. Seals also had significant memory impairment; she could not remember the amount of her Social Security check and did not know the time or the day. Seals told Blair that Aviles brought her food and paid some of the bills, but Blair discovered that Seals's phone service was terminated due to nonpayment. Blair further testified that Seals relied on Aviles to make decisions, and that when she asked Seals for Aviles's phone number, Seals declined, stating "David * * * wouldn't like that."

Sister Susan Lachapelle, a registered nurse certified in community health, testified that she first visited Seals in May 1996, and discovered rats in the building and an illegal electrical hookup in Seals's apartment. In July 1996, she discovered that Seals's apartment was without electricity.

Ann Burgess, a psychiatric social worker and expert in the field of elder abuse, who had not examined Seals, testified that

---

2. Dr. Landau was not called as a witness at trial.

she reviewed Blair's notes, the records of Lachapelle's agency and the article 81 petition. It was her opinion that Seals suffered a "crisis" event as a result of the fire and the City's order to vacate the premises, which impaired her thought process. She also testified that in her opinion, Seals was being exploited.

For the defense, Aviles testified, over plaintiffs' objection pursuant to the Dead Man's Statute (CPLR 4519), that he borrowed both the $15,300 obtained from Seals's checking account and the funds made available by the use of her credit cards. Additionally, Aviles was permitted to testify, over plaintiffs' continuing objection, that he "cashed" the 10 mortgage checks drawn on his account by having Seals endorse them, he deducted $500 that Seals owed him for rent and then paid her the balance of $1,160 in cash. He admitted that he had no records or receipts documenting these transactions, claiming that Seals "kept a record of it."

The jury returned a verdict finding that Aviles had not obtained the property through fraud or undue influence; that Seals did not suffer from mental incapacity at the time of the transfer; that Aviles made no promise to allow Seals to live rent-free in the building in consideration for Seals transferring the building to Aviles for $50,000; that Seals agreed to pay rent of $500 per month; and that Aviles should be credited for $14,000 in mortgage payments to Seals.

However, the jury did find Aviles liable in the amount of $26,000 in unpaid mortgage payments, $30,000 for using Seals's credit cards, and in an amount of $15,300 for moneys obtained from Seals's checking account.

Plaintiffs moved posttrial for judgment notwithstanding the verdict on their application to set aside the transfer of the building as based upon fraud or undue influence. Plaintiffs argued that the jury's verdict in favor of Aviles was against the weight of the evidence in that it ignored the multiple frauds perpetrated upon Seals involving the alleged mortgage payments, cash and use of Seals's credit cards.

Alternatively, plaintiffs moved for a new trial based on alleged errors committed by the trial court, including violations of the Dead Man's Statute (CPLR 4519), improper preclusion of Seals's credit card statements, and the erroneous imposition of a "clean hands" requirement on plaintiffs. Plaintiffs further requested that the court amend its judgment to award interest: (1) on the $26,000 unpaid mortgage debt, from the date of Aviles's last payment; (2) on the $15,300 Aviles "borrowed" from Seals, from the dates each check was deposited into

Aviles's account; and (3) on the $30,000 in credit card charges, from the date Aviles incurred these charges.

The trial court denied plaintiffs' motion to set aside the verdict as against the weight of the evidence, ruling that in light of the jury's finding that Aviles did not acquire the building by fraud or undue influence, the sale would not be rescinded. The court also declined to set aside the verdict based on the alleged trial errors and refused to award prejudgment interest on the ground that the "point is moot because the interest rate on the mortgage" is the same as the 9% statutory rate.

■ On appeal, plaintiffs argue that because clear and convincing evidence established that Aviles obtained the property from Seals through fraud and undue influence, the jury could not have reached its verdict on any fair interpretation of the evidence. Alternatively, they contend that various errors committed by the trial court, such as admitting Aviles's explanation concerning his use of the funds in violation of the Dead Man's Statute and precluding evidence demonstrating the breadth of Aviles's fraudulent scheme, effectively prevented them from meeting their burden of proof to rescind the sale. As we agree with both of these arguments, we modify the judgment and remand for a new trial.

Preliminarily, we note that the parties and the trial court erroneously assumed that plaintiffs bore the burden of proof on their equitable claim to rescind the transfer as the product of fraud or undue influence. "Normally, the burden of proving undue influence rests with the party asserting its existence (*see, Allen v La Vaud*, 213 NY 322). However, if a confidential relationship exists, the burden is shifted to the beneficiary of the transaction to prove the transaction fair and free from undue influence (*see, Matter of Gordon v Bialystoker Ctr. & Bikur Cholim*, 45 NY2d 692, 699; *Cowee v Cornell*, 75 NY 91, 99-100; *McClellan v Grant*, 83 App Div 599, 602, *aff'd* 181 NY 581)." (*Matter of Connelly*, 193 AD2d 602, 602-603 [1993], *lv denied* 82 NY2d 656 [1993].)

In *Matter of Gordon v Bialystoker Ctr. & Bikur Cholim* (45 NY2d 692 [1978]), the Court of Appeals held that in light of the fiduciary relationship between the 85-year-old donor and the defendant nursing home-donee at the time of the donor's gift of funds, the burden shifted to the home to establish that it did not acquire the donor's property by fraud, undue influence or coercion, a burden that the nursing home failed to meet. As the *Gordon* Court (45 NY2d at 698) explained:

"[W]here a fiduciary relationship exists between parties, 'transactions between them are scrutinized with extreme vigilance, and clear evidence is required that the transaction was understood, and that there was no fraud, mistake or undue influence. Where those relations exist there must be clear proof of the integrity and fairness of the transaction, or any instrument thus obtained will be set aside or held as invalid between the parties' (*Ten Eyck v Whitbeck*, 156 NY 341, 353)."

Appellate courts in this state have, time and time again, applied this burden-shifting mechanism to evaluate transactions which, at least on the surface, appear to involve the exploitation of elderly or mentally incapacitated persons by those intent on violating the trust reposed in them (*see Matter of Mazak*, 288 AD2d 682, 684 [2001] [no basis to disturb Surrogate's finding that respondent failed to rebut presumption that conveyance by 80-year-old decedent three weeks before her death was result of controlling or undue influence]; *Peters v Nicotera*, 248 AD2d 969, 969-970 [1998] [nephew failed to meet burden of showing that 80-year-old aunt's execution of deed transferring house to him was not product of undue influence or coercion]; *JML Invs. Corp. v Hilton*, 231 AD2d 493, 493-494 [1996] [home health aide failed to meet burden of showing that 80-year-old decedent's conveyance of home to aide was not product of undue influence]; *Matter of Connelly*, 193 AD2d at 602-603 [beneficiary of certificate of deposit failed to sustain burden by clear and convincing evidence that creation of certificate in favor of beneficiary by decedent, who had suffered stroke only months before, was fair and free from undue influence]; *see also Matter of Greiff*, 92 NY2d 341, 345-347 [1998] [Appellate Division incorrectly placed burden on wife to show that prenuptial agreement was procured by fraud or overreaching; case remanded to consider whether relationship between parties was the type that requires a shifting of burden to the proponent of agreement]).

In any event, even under the erroneous burden of proof applied in this case, the jury's finding that Aviles did not obtain the property by fraud or undue influence was against the weight of the evidence. It is well settled that a jury verdict may be set aside as against the weight of the evidence only where "the jury could not have reached the verdict on any fair interpretation of the evidence" (*Jamal v New York City Health & Hosps. Corp.*, 280 AD2d 421, 422 [2001]; *see also Matter of*

*Clines*, 226 AD2d 269, 269-270 [1996], *lv dismissed* 88 NY2d 1016 [1996]). The jury's verdict here was completely at odds with any fair interpretation of the evidence.

The trial testimony established that at the time of the transfer, Seals was an 80-year-old woman in declining health who had recently suffered a traumatic crisis resulting from a fire in the building next door, requiring her to vacate the premises for two months. The testimony of social worker Blair established that by December 1995, only 16 months after the conveyance, Seals was totally homebound and dependent on others, especially Aviles, to do her banking, shopping and to provide her with transportation to medical appointments. She also was suffering from significant memory impairment by that time. This evidence of Seals's mental condition was corroborated by the medical testimony of Dr. Forster, who provided his expert opinion that Seals was suffering from severe Alzheimer's dementia in 1994, although not as severe as in 1996 when he examined her. In our view, the evidence of Seals's severe mental impairment, both at the time of transfer and in the two years following, far outweighed the self-serving, lay opinions of Aviles and Freedman that Seals appeared coherent and lucid at the closing (*see Matter of Clines*, 226 AD2d at 270 [medical testimony of decedent's impaired mental capacity at time of gift not overcome by subjective opinions of donee's sister]; *Parker v Parker*, 66 AD2d 328, 332 [1979] [evidence of existence of mental illness subsequent to critical date, especially when proximate to that date, is relevant to wife's mental condition on date stipulation signed]).

Seals's dependence on Aviles was further confirmed by the testimony of two disinterested witnesses, Blair and Sister Lachapelle, who testified that Aviles told Seals shortly before the sale that if she transferred the building to him, he would take care of her for the rest of her life. In addition, that Seals was represented at the closing by an attorney she had never met before and who was referred by the buyer, Mr. Aviles, is a circumstance noted in many prior cases as raising a serious question of improper influence (*see Matter of Greiff*, 92 NY2d at 344 [inference of undue influence in prenuptial agreement raised, in part, by fact that husband "selected and paid for" wife's attorney]; *see also Peters v Nicotera*, 248 AD2d at 970 [nephew brought 80-year-old aunt to office of attorney she had never met and aunt not independently represented by counsel]).

Additional clear and convincing evidence adduced by plaintiffs reveals a series of transactions permeated by undue

influence. Aviles's unfettered use of Seals's funds and credit cards, which Aviles admitted at trial, provides convincing evidence that he was exploiting Seals's impaired condition for his own financial gain. Finally, his brazen conduct in writing out mortgage checks to Seals, having her endorse them, and then depositing them back into his own account raises the strongest inference that the mortgage agreement was a sham, and his intent was to obtain Seals's building through improper means. In light of the trial evidence, we find that the jury's verdict that Aviles did not obtain Seals's property by fraud or undue influence could not have been reached on any fair interpretation of the evidence (*Matter of Clines*, 226 AD2d at 269-270 [no fair interpretation of the evidence would support court's finding that respondent obtained possession of property by valid inter vivos gift by decedent]).

 Even if we concluded that plaintiffs had failed to meet their (erroneous) evidentiary burden, a reversal is nevertheless required because of the trial court's repeated admission of testimony in violation of the Dead Man's Statute (CPLR 4519). "CPLR 4519 disqualifies parties interested in litigation from testifying about personal transactions or communications with deceased or mentally ill persons (Prince, Richardson on Evidence § 6-121, at 325 [Farrell 11th ed 1995])." (*Poslock v Teachers' Retirement Bd.*, 88 NY2d 146, 150 [1996].). The underlying purpose of the rule is "to protect the estate of the deceased from claims of the living who, through their own perjury, could make factual assertions which the decedent could not refute in court" (*Matter of Wood*, 52 NY2d 139, 144 [1981]). "The statute prevents any person 'interested in the event' from testifying to a 'personal transaction' with the deceased unless the representative of the deceased has waived the protection of the statute by testifying himself or introducing the testimony of the decedent into evidence at trial" (*id.*).

Plaintiffs identify numerous instances where the trial court, over their objection, permitted Aviles to testify regarding transactions or communications with the deceased. We focus on only two of them. First, in response to his attorney's questioning as to why the 10 mortgage checks for $1,660 made out to Seals were "deposited" back into his own account, Aviles was allowed to testify that he and Seals had an "arrangement" whereby Seals would endorse the check, he would deduct $500 for Seals's monthly rent payment for himself and then give Seals the $1,160 balance in cash. We note that this "arrangement" was not documented by any records or receipts and that

due to Seals's demise, there are no witnesses to refute Aviles's explanation as to why the mortgage checks never reached her account.

A second violation of the Dead Man's Statute occurred when, during questioning concerning the $15,300 obtained from Seals's checking account and the "re-deposited" mortgage payments, Aviles was permitted to testify that "[Seals] basically lent me the money" to help him rehabilitate the building in order to qualify for additional financing.

These and other explanations offered by Aviles at trial explaining his apparent misuse òf Seals's funds, to the extent they involve personal transactions or communications with the deceased, should have been excluded pursuant to the Dead Man's Statute (*Matter of Wood*, 52 NY2d at 143 [respondents' testimony admitting withdrawals from decedent's account, but contending they converted money to cash and delivered it to decedent while he was in his sickbed, should have been excluded under Dead Man's Statute]; *Ptasznik v Schultz*, 247 AD2d 197, 199 [1998] [defendants properly precluded from testifying as to communications with decedent regarding whether money he gave them was a gift or a loan]).

The erroneous admission of this evidence cannot be considered harmless, since there was no other competent evidence at trial establishing either that Aviles's mortgage checks were "cashed" as a courtesy to Seals and the balance remitted to her, or that the checks drawn on Seals's account were "loans" agreed to by Seals (*cf. Matter of Wieczorek*, 186 AD2d 204 [1992], *lv dismissed* 81 NY2d 990 [1993]). In fact, without Aviles's dubious explanations, there was nothing in the record to refute the damaging evidence of Aviles's financial misconduct offered on plaintiffs' direct case.

Nor did plaintiffs waive the protections of the Dead Man's Statute by offering plaintiff Elba Sepulveda's direct testimony concerning her observations of Seals's conduct and demeanor, as Sepulveda assiduously avoided any testimony pertaining to any transactions or communications with Seals (*see Matter of Wood*, 52 NY2d at 145-146). Although Sepulveda was questioned on cross-examination concerning communications with the decedent, the rule is that testimony elicited on cross-examination of a personal representative of the deceased by the adverse party does not waive the protections of the statute (*see Matter of Sklaire v Eldridge*, 12 AD2d 386, 388 [1961]; Prince, Richardson on Evidence § 6-128, at 345 [Farrell 11th ed]).

Nor, as Aviles suggests, is the Dead Man's Statute being improperly used as a sword instead of a shield. The testimony and documentary evidence offered on plaintiffs' direct case by disinterested witnesses regarding various transactions involving Seals's and Aviles's accounts did not "open the door" to Aviles's explanations that he borrowed the funds, or returned most of it to Seals in cash (*see Matter of Wood*, 52 NY2d at 145-146 [documentary evidence and banker's testimony concerning banking transactions and that diligent search failed to reveal whereabouts of funds did not open the door]). In any event, even though the statute bars his testimony concerning transactions with Seals, Aviles could easily have protected himself by documenting any loans from Seals, by not depositing the mortgage payments back into his account and by using his own credit cards to finance his building projects. The explanations provided by Aviles are precisely the type of evidence that the Dead Man's Statute was intended to prohibit (*see Matter of Wood*, 52 NY2d at 143), and their admission at this trial constitutes reversible error.

Based on the foregoing, plaintiffs' cause of action seeking to rescind the sale of the building must be retried. Further, the jury's award to plaintiffs of $26,000 in unpaid mortgage payments is likewise set aside, premised as it is on the existence of a valid transfer, which is exactly the issue that must be determined at the new trial.

The jury's verdicts in favor of plaintiffs in the amount of $30,000 for the use of Seals's credit cards, and $15,300 for funds obtained from her checking account, remain intact. However, plaintiffs contend that the court should have awarded prejudgment interest on those causes of action at law from the time the decedent was deprived of the use of her funds. We agree, and further modify to direct the court to amend its judgment to award prejudgment interest on those recoveries in accordance with the provisions of CPLR 5001 (*see Spodek v Park Prop. Dev. Assoc.*, 96 NY2d 577, 580-581 [2001]).

Plaintiffs' remaining contentions are unavailing.

Accordingly, the judgment of the Supreme Court, New York County (Norman Ryp, J.), entered September 18, 2002, which, after a jury trial, to the extent appealed from, denied plaintiffs' application to set aside a transfer of real property as based on fraud and undue influence, and bringing up for review an order, same court and Justice, entered on or about July 9, 2002, which, inter alia, denied plaintiffs' motion to set aside the jury's verdict as against the weight of the evidence and to award

prejudgment interest from specified dates, should be modified, on the law, the facts and in the exercise of discretion, the motion to set aside the verdict granted and the judgment vacated to the extent of remanding for a new trial on plaintiffs' cause of action seeking to set aside the transfer, the jury's award for $26,000 in unpaid mortgage payments vacated, and the trial court directed to award prejudgment interest to plaintiffs on the jury's verdicts for $30,000 and $15,300, respectively, and otherwise affirmed, without costs.

NARDELLI, J.P., MAZZARELLI, ROSENBERGER and ELLERIN, JJ., concur.

Judgment, Supreme Court, New York County, entered September 18, 2002, modified, on the law, the facts and in the exercise of discretion, plaintiffs' motion to set aside the verdict granted and the judgment vacated to the extent of remanding for a new trial on plaintiffs' cause of action seeking to set aside the transfer, the jury's award for unpaid mortgage payments vacated, and the trial court directed to award prejudgment interest to plaintiffs, and otherwise affirmed, without costs.