*464 Judgment, Supreme Court, Bronx County (Yvonne Gonzalez, J.), entered August 28, 2007, after a jury trial, awarding plaintiff $244,441.99, inclusive of interest and costs, affirmed, with costs.
“[T]he question of whether a verdict is against the weight of the evidence involves what is in large part a discretionary balancing of many factors (see Mann v Hunt, 283 App Div 140). For a court to conclude as a matter of law that a jury verdict is not supported by sufficient evidence, however, requires a harsher and more basic assessment of the jury verdict. It is necessary to first conclude that there is simply no valid line of reasoning and permissible inferences which could possibly lead rational [persons] to the conclusion reached by the jury on the basis of the evidence presented at trial” (Cohen v Hallmark Cards, 45 NY2d 493, 499 [1978]). The party seeking this finding faces a “lofty hurdle” (Adamy v Ziriakus, 92 NY2d 396, 400 [1998]). As a result, “in any case in which it can be said that the evidence is such that it would not be utterly irrational for a jury to reach the result it has determined upon, and thus a valid question of fact does exist, the court may not conclude that the verdict is as a matter of law not supported by the evidence” (Cohen, 45 NY2d at 499).
A fair interpretation of the evidence (see McDermott v Coffee Beanery, Ltd., 9 AD3d 195, 205-206 [2004]) supports the jury’s findings that defendant breached the parties’ contract, that the partial waivers signed by plaintiff were coerced by economic duress, and that plaintiff sustained the damages it claimed.
The dissent disagrees with the jury’s verdict, characterizing the testimony of plaintiffs president as incredible and contending that the judgment should be vacated and the matter remanded for a new trial. However, “[disputes as to proof are for the jury to resolve in assessing . . . the credibility of the witnesses” (Manne v Museum of Modern Art, 39 AD3d 368 [2007] [internal quotation marks omitted]), and the jury’s “resolution of any conflicting evidence is entitled to deference” (id.).
The facts are set forth in the dissent. In the interest of brevity, we will not provide a separate statement of the facts, although we do not agree with all of our colleague’s characterizations of the testimony presented at trial.
Plaintiffs president testified that he believed the installments listed in the purchase order in question would be paid in full on the date listed regardless of the amount of work completed as of those dates. He further testified that, at least in the early part of its performance of the purchase order, its electricians had to wait until certain other work was done, such as the installation of the sprinkler system by plumbers, before they could fully *465 staff the project. As a result, according to plaintiffs president, it made sense to have fewer electricians working at the beginning of the project and more as the project neared completion. Although there was some equivocation as to the number of electricians plaintiff committed to have on the job at the beginning of the project, this was an issue for the jury to take into consideration during its deliberations. The jury could easily have credited this testimony instead of defendant’s vice-president’s testimony that plaintiff was not providing enough workers in the early stages of the job, requiring defendant to employ its own electricians and deduct that cost from plaintiffs invoices. Although the purchase order provided that “[fiailure to deliver materials or services in a timely fashion will release contractor from any obligation to purchase implied by this order,” nowhere in the purchase order is there any indication that plaintiff was to have completed a certain amount of work on the specified payment dates in order for a particular installment to be paid in full. Nor can it be said that plaintiff is claiming that it needed to do nothing to get paid, as the dissent seems to characterize plaintiffs position, as plaintiffs president clearly testified that his concept of the project was to provide the bulk of his electricians toward the end of the project, when the other trade craftsmen had completed their work and were out of the way. As plaintiffs president testified on cross-examination: “Most of the work is going to be done closer to the end of the job. So the last two weeks or the last month we could be using, you know, it could be any amount of electricians there. We could be using up to forty electricians at the end of the job in the last two weeks to do different things ... So all the equipment that the other trades working needs to be out of the building, and the electricians was doing the testing for—need to have clear reign to pull stations and go back and forth to the main board . . . [W]e could need forty guys at the end. There was never a discussion about exactly how many electricians we were going to use at any one time.”
A fair interpretation of this testimony supports the jury’s implicit conclusion that plaintiff did not fail to deliver services in a timely fashion.
Moreover, the jury was free to reject defendant’s testimony and documentary evidence regarding its claim that plaintiff did not have a sufficient number of electricians on the job site to timely complete the work. The dissent argues that defendant submitted documents (consisting mostly of its own letters to plaintiff) to support its claim that plaintiff failed to provide adequate personnel to complete the job, and that there was no *466 written evidence from plaintiff that protested or contradicted defendant’s letters. However, it is undisputed that one of the reasons why plaintiff was hired by defendant as its subcontractor was the fact that Ray Evans, an employee of defendant, had previously worked with plaintiffs president and knew his work. Plaintiffs president testified that he normally would have responded to defendant’s letters in writing but, because of his relationship with Evans, he instead had oral discussions with Evans and defendant’s vice-president. In fact, when asked about any writings sent by defendant to plaintiff, plaintiffs president testified on cross-examination that, while he did not respond to each of defendant’s letters in writing, “I was in contact with, I was in contact with Ray, and um, and we were discussing constantly and he was the one that was actually writing, doing the paperwork.” Defendant did not call Evans as a witness to rebut this testimony. Moreover, plaintiffs president also testified that with respect to plaintiffs invoice for the second installment payment, he deducted defendant’s labor costs under duress. He testified, again on cross-examination:
“Q. Then he does a calculation of, um, Costal’s cost, that they will need to deduct in order to make up the—for the people that they have provided to the job site; do you see that?
“A. Yes. I see that yes, and I never agreed to this.
“Q. Then they send you this letter and then before you can get payment, you have to sign a partial waiver and release of lien, correct?
“A. Yes.
“Q. So is this why you testified earlier that you were forced to sign this?
“A. I need to get my money and I signed it, yes, to get the money.”
The jury obviously credited this testimony and, on this record, it cannot be said that it was unfair to do so.
Nor do plaintiffs invoices provide support for defendant’s position that plaintiff failed to provide adequate workers to perform the necessary work in a timely manner. While the dissent correctly points out that “plaintiff provided its certified payroll records to defendant as it was processing the installment payments,” the actual invoices/payment requisitions that plaintiff submitted to defendant neither included nor referenced payroll records.* Defendant’s letters to plaintiff do not suggest that plaintiff had to submit payroll records in order to be paid, *467 and such are not required pursuant to the terms of the purchase order. As noted, the purchase order itself, which was drafted by-defendant, does not provide for completion by plaintiff of a certain percentage of the work to receive the first payment, an additional percentage of the work to receive the second payment, and so on. In fact, plaintiffs president testified on cross-examination that defendant did not pay the full amount of the first installment because it “didn’t have the money to pay me.” The following colloquy took place:
“Q. They told you that they did not have the money to pay you?
“A. Yeah. They were—um, you know, they were like let’s work, let’s work it out next month and partial payment and we’ll work it out next month.”
This presented a clear conflict in the testimony that was for the jury to resolve. The jury could fairly conclude that plaintiff was paid less than the full amount of the first installment not because it failed to deliver services in a timely fashion, but because defendant did not have the money. The jury could also fairly find that plaintiff’s request for $250,000 instead of $237,500 (the amount set forth in the purchase order) in its second requisition resulted from, as plaintiffs president testified, defendant’s failure to pay the full contract amount requested in the first invoice ($80,000 instead of $107,350), and not because it claimed it did additional work on the project. This too is an issue of credibility that the jury resolved in plaintiffs favor.
Plaintiffs claim that defendant guaranteed that it would make a profit, when viewed in the context of the entirety of the negotiations leading up to the contract, does not strain credulity as suggested by the dissent. Plaintiff’s original proposal to install the fire alarm system was in the amount of $1,375,667. Defendant found this price to be too high, and the parties entered into negotiations, eventually agreeing on a price of $1,130,000. According to plaintiffs president’s testimony, defendant said that plaintiffs original proposal was “overkill on the profit” and that “we [defendant] are sure you [plaintiff will] make money if you give us the better price, and will still make . . . a lot of profit.” The jury could fairly have credited plaintiffs testimony in this regard in arriving at its verdict.
Finally, plaintiff is not impermissibly seeking to recover on a theory of quantum meruit. The trial court instructed the jury, without objection, “The non-breaching party is allowed to rescind the contract ... It may . . . sue in quantum meruit for the reasonable value of the services that it provided to the *468 breaching party, less any payments already received” (see Whitmyer Bros. v State of New York, 47 NY2d 960, 962 [1979]).
In brief, the credibility and weight of plaintiffs president’s explanations as to why he complied with certain demands from defendant, such as the production of payroll records, and did not respond in writing to defendant’s letters raised issues that were appropriately left to the jury, and it cannot be said that the jury’s conclusions are against the weight of the evidence.
A court may not interfere with the fact-finding function of a jury because it would have evaluated credibility in a different manner (McDermott v Coffee Beanery, Ltd., 9 AD3d at 206; Rivera v 4064 Realty Co., 17 AD3d 201, 203 [2005], lv denied 5 NY3d 713 [2005]).
Since we find the jury’s verdict is based upon a valid line of reasoning supported by sufficient evidence, we affirm the judgment entered in this case.
While defendant’s challenge to plaintiffs summation is not preserved, we nevertheless find that the challenged remarks generally constituted fair comment on the evidence and did not deprive, defendant of a fair trial (see Hancock v 330 Hull Realty Corp., 225 AD2d 365, 365 [1996]). Concur—Sweeny, Renwick and Freedman, JJ.
Friedman, J.E, and McGuire, J., dissent in a memorandum by McGuire, J., as follows: Defendant was hired by an electrical subcontractor on a project to build a two-story administrative facility for the Metropolitan Transportation Authority (MTA). Defendant, in turn, retained plaintiff to install the facility’s fire alarm system, a job that entailed installing conduit, pulling wire, installing fire alarm devices and testing the system. The entire project, including plaintiffs work, was a “fast-track” job.
The parties signed a purchase order agreement, dated March 1, 2004. The agreement provided, among other things, that the “[p]roject is as per plans and specifications,” that plaintiff would supply the “[l]abor to install [the] complete fire alarm system” and that the work was to be completed by June 7, 2004. Plaintiff was to be paid a total of $1,130,000 under the agreement, pursuant to the following schedule:
• Payment no. 1—March 29, 2004—$107,350
• Payment no. 2—April 26, 2004—$237,500
• Payment no! 3—June 07, 2004—$237,500
• Payment no. 4—June 28, 2004—$276,450
• Final payment—July 26, 2004—$271,200.
*469 However, the payment schedule was “subject to change.” The “Terms” portion of the purchase order stated, in relevant part, that the “[flailure to deliver materials or services in a timely fashion will release contractor [i.e., defendant] from any obligation to purchase implied by this order.”
Plaintiff began working at the job site on or about March 1 when the purchase order agreement was signed. Plaintiff did not complete the work required by the purchase order and walked off the job site on June 9. The parties offer competing versions of what occurred between the date plaintiff began work and the date it abandoned the job site. The parties’ accounts of the facts are discussed below.
In its complaint, plaintiff alleged that defendant breached the purchase order agreement and seeks to recover $243,341.99, the difference between the amount of money it spent on the project ($375,600.65) and the amount it was paid by defendant ($174,491.57) plus its “allowance for overhead and profit” ($42,232.91). Defendant asserted a counterclaim for breach of the purchase order agreement, seeking damages for the costs it incurred to complete the installation of the fire alarm system ($472,080).
Plaintiffs theory of its case was that defendant was required to make the installment payments on the dates specified in the purchase order regardless of the extent to which plaintiff had completed its work; defendant failed to make the payments, forcing plaintiff to incur debt to perform its work; and defendant, without plaintiff’s consent, used its own workers to perform the work and charged plaintiff for the costs it incurred to complete the work.
Defendant’s theory of its case was that the purchase order was a “lump-sum” contract pursuant to which plaintiff would submit requisitions reflecting the amount of work plaintiff had performed and defendant would issue installment payments based on the amount of work completed. According to defendant, plaintiff failed to advance the work as anticipated under the purchase order and failed to assign sufficient numbers of electricians to the job. Consequently, defendant was required to assign its own workers to augment plaintiffs work force. Defendant claimed that pursuant to an oral agreement the parties made after executing the purchase order, it was entitled to charge plaintiff for the costs of augmenting the work force and to deduct those costs from plaintiffs installment payments.
On its case, plaintiff presented only one witness, its president, who testified that he believed plaintiff would be paid the *470 installment payments in full on the dates listed in the purchase order regardless of the amount of work plaintiff had completed. This was so, according to plaintiffs president, because defendant did not provide plaintiff with “mobilization” money before the work commenced. Plaintiffs president testified that defendant guaranteed him that plaintiff would make a profit on the project.
On cross-examination, plaintiffs president was equivocal in his testimony regarding whether he promised defendant prior to the execution of the purchase order that plaintiff would employ at least 15 electricians on the project. Thus, when asked if “[d]uring your preliminary meetings with [defendant], didn’t you promise [defendant] that you would employ between fifteen and eighteen electricians on the project,” plaintiffs president responded: “I don’t, I don’t remember a number like that because my, my understanding of the job is that as soon as we are able to use more electricians we would use as, as much [sic] electricians as we need, and, therefore, we would end up with thirty at the end of the job, or we could end up with twenty at the end of the job, depending how the job—because most of the equipment is going to be done at the end of the job anyway. Most of the work is going to be done close to the end of the job. So the last two weeks or the last month we could be using, you know, it could be any amount of electricians there . . . There was never a discussion[ ] about exactly how many electricians we are going to use at any one time ... I could not have told them exactly how much [sic] electricians.”
By a requisition dated March 24, 2004, plaintiff requested from defendant the first installment payment of $107,350. The requisition did not delineate the work plaintiff had performed on the job site and merely demanded the payment specified in the purchase order. Defendant’s vice-president responded to the requisition in a letter dated March 31 stating:
“As per our discussion this morning, we will be supplying approximately 10 men with a Foreman to perform work associated with your contract for the Fire Alarm system at the above referenced project. The work performed by our work force will need to be deducted from your contract accordingly. Please be aware that this will affect the payment schedule that was put in place at the beginning of the project. In order to see how it will affect future payments, we really need to see how the job progresses a little bit before assessing the costs associated.
“In terms of payment #1, we will need to reduce the payment slightly based on the fact that we will be adding significant manpower with large cash flow needs to perform your contract *471 work. I have received your certified payrolls for the weeks ending February 25, 2004 and March 3, 2004. They show for the month of February 2004 a total of 259 Regular Hours were worked by [plaintiff] personnel (42 Foreman, 140 Journeyman, 77 Apprentice). Your total certified payrolls for those two weeks show 462 Regular Hours (63 Foreman, 224 Journeyman, 175 Apprentice). Your approximate total cost for these weeks is $31,000. We know that you have been working onsite since this and have worked an additional 1,200+ hours through 3/24/04. Therefore, for payment #1, we are offering to release $80,000 immediately to [plaintiff]. A new partial waiver of lien is enclosed for your review and signature. As soon as the waiver is received, your check will be available .... Please understand we are doing everything we can to work with you on this project and make sure both of our companies are protected. Our goal is to build a successful project for our client, and in doing so, we need to ensure that the specific demands in terms of performance and scheduling of this contract are met, which is why it is essential that we step in and make some adjustments to your current contract.”
Plaintiffs president acknowledged that he received and read the letter but denied agreeing with defendant’s vice-president that defendant should augment plaintiffs work force. According to plaintiffs president, he objected to defendant augmenting plaintiffs work force because there were too many other trades on the site at that time, and he needed further information about the project to prioritize the work and ascertain the specific number of electricians needed at various stages of the project. Although plaintiffs treasurer executed the partial waiver and release of lien and accepted the payment, plaintiffs president testified that the treasurer had no choice but to sign the waiver so plaintiff could get paid. No evidence other than plaintiffs president’s testimony supported that assertion.
Plaintiff submitted a requisition for the second installment payment, requesting $250,000.[1] By letter dated May 5, 2004, defendant’s vice-president advised plaintiffs president that the second installment payment would be released after defendant received plaintiff’s certified payrolls as well as an executed partial waiver and release of lien. The letter stated, among other things: “In terms of the payment amount, as you are aware, [defendant] has taken on a large portion of [plaintiffs] *472 Fire Alarm work for this project. As it has been discussed with you several times, adjustments to your contract and payment schedule needed to be made in order to account for the additional work [defendant] was performing on [plaintiffs] behalf. The costs that [defendant] has incurred will be deducted from each payment accordingly.”
By another letter, dated May 6, 2004, defendant’s vice-president described the deductions from the second installment payment. The letter contained a detailed description of the costs of the work force defendant assigned to work with plaintiffs employees. The letter noted that for the five-week period covered in the second requisition, defendant’s employees had worked a total of 2,069 hours at the job site with a total labor cost of $163,843.36. Subtracting this sum and the amount of defendant’s overhead costs ($14,745.90) from the $250,000 requested by plaintiff and adding a $28,373.33 advance on the third installment payment, defendant offered plaintiff $99,784.07 on its second requisition. Significantly, plaintiffs own invoice for the second installment payment reflects that plaintiff deducted from the amount it requested defendant’s “labor costs” and “expense costs.” Again, plaintiffs treasurer executed a partial waiver and release of lien and plaintiff accepted the payment offered by defendant.[2]
Plaintiffs president testified that he did not agree voluntarily to the deductions but, rather, “had no choice” because “[plaintiff] had men working on the job. Um, we needed to get paid, and we needed to pay the union and pay workers, and other expenses that we had. So we had to take whatever they were giving .... I basically had no choice. We were not allowed—we went along.” No other evidence, however, supports that assertion and plaintiff’s president acknowledged that he never submitted a written protest to defendant regarding the deductions.
Plaintiff submitted a requisition for the third installment payment, requesting $315,000. Defendant’s vice-president responded to this requisition by letter dated June 8, 2004. The letter stated: “As you are aware and as we have advised you in earlier correspondence, [defendant] has provided manpower to [plaintiff] in order to expedite the installation of [plaintiff’s] contract electrical work associated with the *473 fire alarm [ ] system . . . When it was decided that [defendant] would need to provide additional manpower to assist in [plaintiffs] contract work, [defendant] immediately informed you that [defendant’s] costs associated with this additional work performed on [plaintiffs] behalf would be deducted from each of [plaintiffs] contract requisition payments according to all costs incurred up through the date of the payment.”
The letter provided a detailed breakdown of the costs of the work force defendant assigned to work with plaintiffs employees, noting that during the four-week period covered in the third requisition, defendant’s employees had worked 4,081 hours at the job site with a total labor cost of $353,887.47. This sum, combined with the amount of defendant’s overhead costs ($31,849.87), exceeded the amount requested ($315,000) by $70,737.34. Thus, defendant’s vice-president wrote:
“[Pjlease be advised that [plaintiff] is seriously delinquent in the execution of [its] contracting work. In accordance with your submitted proposal and scope of work as well as [the] purchase order . . . the fire alarm system was to be substantially complete by June 7, 2004. Please be advised that [plaintiffs] forces are currently only about 30% complete with their scope of work. The first floor conduit system has still not been completed and no work has been installed on the second floor by [plaintiffs] personnel. This situation is unacceptable and more efficient output needs to be achieved by [plaintiff].
“Please be advised that [defendant] is doing everything it can to minimize its exposure on the fire system, however, we do have a schedule to maintain and a contract to abide by. Additionally, we need to ensure that our contractual obligations are being met in the timeframes that they need to be. Therefore, [defendant] will continue providing the necessary manpower to execute [plaintiffs] contract work on the fire system as long as [plaintiff] continues providing insufficient labor and production on the project.”
Plaintiffs president testified that he did not agree that the expenses for defendant’s costs for performing work on the fire alarm system should be deducted from the third installment payment. Again, however, plaintiff provided no evidence corroborating that it objected to the deductions.
On June 9 plaintiff demobilized its operations at the job site and abandoned the project. Defendant’s vice-president sent plaintiff a letter dated June 11 that stated:
“On Wednesday, June 9, 2004, [plaintiff] de-mobilized from the site and completely abandoned the . . . project. We must point out that your abandonment of the project occurred *474 without so much as a phone call, correspondence, or any other type of communication or notification whatsoever.
“Before its abandonment; [plaintiff] was already in breach of its contract. [Defendant], who was already assisting in the execution of [plaintiffs] subcontract because you were unable or unwilling to do so, will now need to incur substantial additional costs in order to complete the fire system that [plaintiff] was contracted to install. We will hold [plaintiff] responsible for all of the associated additional costs and damages.”
Plaintiffs president denied that plaintiff did not notify defendant before abandoning the project. He testified that “[w]e were talking all the time about getting paid, and I let them know that if I don’t get my money I have no choice. I won’t spend any more money at this job, doesn’t make any sense, especially since they said I owed them $70,000.”
On its case, defendant presented one witness, its vice-president, who testified that the purchase order was a “lump-sum” contract pursuant to which plaintiff would submit requisitions reflecting the amount of work it had performed and defendant would issue installment payments based on the amount of work completed. Defendant, according to its vice-president, never guaranteed plaintiff that it would make a profit on the project. Defendant’s vice-president stated that at a meeting shortly before they executed the purchase order, the parties agreed that, on average, plaintiff should have between 15 and 18 electricians on the job site but that there should be additional manpower at the site to perform the first phase—the installation of the conduit—which was the most time-consuming and difficult portion of the work.[3] Defendant’s vice-president also testified that all drawings and specifications for plaintiffs work were completed and provided to plaintiff before the purchase order was executed.
With respect to plaintiffs work on the job site, defendant’s vice-president stated that when plaintiff first began working at the site in the end of February, plaintiff performed several days of preparatory work prior to installing conduit on the first floor of the building. Based on plaintiffs certified payroll reports, defendant’s vice-president testified that during its first week at the job site, plaintiff had only four to six electricians on the site; during the second week, plaintiff assigned approximately 10 *475 electricians; during the third week approximately 11 electricians; and during the fourth week, approximately 14 electricians, the most plaintiff ever assigned to the site.
According to defendant’s vice-president, he or one of his coworkers called plaintiffs president once or twice a week in each of the first three weeks plaintiff was on the project to express defendant’s concern that plaintiff was not assigning enough manpower to the job site. Plaintiffs president repeatedly responded that he was comfortable with plaintiff’s manpower levels. However, defendant’s vice-president testified that he became nervous during plaintiffs fourth week on the job and began calling plaintiffs president more frequently to inquire as to plaintiffs manpower levels.
With regard to plaintiffs requisition for the first installment payment, defendant’s vice-president testified that defendant did not pay plaintiff the $107,350 listed in the purchase order because plaintiff had not performed enough work on the site to warrant the full payment. Defendant’s vice-president testified that he did not decide unilaterally to reduce the first payment. Rather, he called plaintiffs president and wrote him a letter explaining why plaintiff was only receiving $80,000 on the first installment payment. With regard to the call, defendant’s vice-president testified that he expressed his concerns stating: “[T]here wasn’t enough work getting installed to justify the amount of the [full] payment. So we contacted [plaintiff] and explained that we didn’t want to get too far ahead. I explained to him that I went through his certified—how much he had spent, how much manpower, and as of—let me step back—every one time we make a payment it goes through a certain period .... Traditional contracts call for the end of the next month . . . . Now this was a fast track job and we certainly didn’t want to do it to [plaintiff], to have them working all the way through March 31st and not pay them until the end of April. We didn’t think that was a good way. So we tried to come to some medium ground. If we are going to make a payment on the end of March, the period cut off, we were about two weeks early. So when I look at the payment we made to him, I look to the amount of money they spent through March 10th or March 13th and I grew concerned because we were scheduled to make a $107,000 payment, and I think at that . . . they had spent thirty something thousand dollars. So I got a little concerned knowing that . . . they had all this work left to go, and through a requisition period I would have already paid them, paid them two- and-a-half times what they spent .... I explained to them, I explained to them why we were doing it. I wrote a letter explain *476 ing it. We are going to have to reduce your payment based upon this and then the $80,000, I will be very honest, wound up not being an arbitrary amount, I wanted to give them enough money—it was a lot more than he spent—to show them good faith.”
The letter to which defendant’s vice-president referred is the March 31 letter discussed above. When asked about the first sentence of that letter—“As per our discussion this morning, we will be supplying approximately 10 men with a Foreman to perform work associated with your contract for the Fire Alarm system at the above referenced project”—defendant’s vice-president testified:
“The conversation I am referring to is that the—earlier that morning, um, [plaintiffs president] had actually called us and— myself and . . . the President of our company were together in his office when a phone call did come in from [plaintiffs president]. In that conversation basically [plaintiffs president] had stated that he was now concerned about manpower and basically was supporting the concerns that we had had for the last five weeks. In that phone conversation he asked for our assistance . . .
“He asked for our assistance. Well I really didn’t know what he meant. In the initial response was [szc] we need you to put more men at the site. That is [the] only way we are getting it done. He responded that he could not put more men on the site. He was asked in that conversation if we should put men on site. He didn’t, he didn’t respond at that point. [Defendant’s president] put [plaintiffs president] on hold and I had a conversation with [defendant’s president] about my thoughts on the situation at this point because at that point it was my interpretation that he was asking for us to put manpower [on the site]. I actually didn’t want to do it. When I explained to [defendant’s president] what my reservations were, right now we have a clear delineation in the contract, [defendant] is performing certain work on this job, [defendant] hired [plaintiff] to do certain work on this job, if we put our guys on [plaintiffs] work to do that, to help with that, it was not going to be clean cut and dry, and it wasn’t something I thought was not going to be the best way to . . . perform the work . . .
“What I did come up with [during] the conversation, [plaintiffs president’s] concern about actually paying for the additional men and his requisitioning, he had to put up—he told us he could not pay for the additional men cash-wise he could not pay for it. So what I suggested to [defendant’s president] was I said why don’t we ask him to put more men on the site [and] we’ll pay him just for the additional labor . . . We have a *477 local union hall with a lot of electricians on the site, put more men on the site, keep it under [plaintiffs] employ[ ], we’ll pay [plaintiff] once a week for the additional costs, [defendant’s president] agreed . . . Then we got [plaintiffs president] back on the line. He told us that he didn’t want to do it that way. We asked him why. He said his other jobs are busy. He didn’t want to punish other jobs. I understand that, being a contractor, I understand that you have other contract responsibilities and with our project you don’t want to penalize them. We said unfortunately at this point we’ll have to, to go to the union . . . and hire electricians. We need to put them on site and work. He informed us at that point that was not a possibility—all he said in response when we asked him why, he said the union at that time would not give him additional labor. At that point . . . the reality [wa]s we had to put men on the job at that point because we also had a contractual obligation to finish our job. We needed to get the job done. Our electricians could do the same thing as his electricians could, so at that point we had no other alternative after he would or could not put more electricians on the job, we had to supplement his workers and that is why I am writing this letter.” Defendant’s vice-president also testified: “[Plaintiffs president] was, he was fully aware and understood that in order for us to put electricians on his contract work that we had to pay for every week, we had to pay benefits every week, we had to pay the payroll every week for these electricians, that once a month it. . . needed to come . . . directly out of his monthly requisitions in order for us to pay for them.”
After sending the March 31 letter to plaintiff, defendant’s vice-president stated that work force issues continued to plague plaintiffs work. When asked if there “[w]ere any further discussions after March 31st between [him] and [plaintiffs president] concerning the number of electricians that [defendant] was providing to the project for [plaintiffs] account,” defendant’s vice-president responded: “There were a couple more—there was definitely a couple more conversations about the amount of manpower that [defendant] would need to provide, but maybe one or two, not many because as of that March . . . 31st, after that conversation and after that letter it was basically an understanding after that letter was written, after he received the monies, it was basically an understanding that we were going to need to provide electricians to perform a certain scope of work and his electricians were going to be performing their scope of work.” Defendant’s vice-president never received any written or verbal communications from plaintiff protesting the arrangement pursuant to which defendant augmented plaintiffs work force, not even after plaintiff received defendant’s letters *478 of May 5 and 6 deducting a substantial sum from plaintiffs requisition for the second payment.
Defendant’s electricians were not, according to defendant’s vice-president, simply sent to the job site without any purpose or assignment. To the contrary, as defendant’s vice-president explained: “All of our electricians—this was done on purpose— all of our electricians were sent to the second floor. I say it was done on purpose because the second floor—as of March 31st or April 1st, our first day—had never been, had never been touch[ed] in terms [of] the fire alarm. So in order—we spoke to [plaintiffs president], we explained the easiest delineation here is for your crew to continue on the first floor with your installation and our electricians will begin immediately on the second floor. So we sent our electricians to the second floor to begin the fire alarm work.”
Defendant’s vice-president testified that after defendant began augmenting plaintiffs work force, the work on the first floor still did not timely progress. He stated that through the first week of June, plaintiff had not finished installing the conduit on the first floor, the first phase of its work on the site. He also stated that plaintiff had “not pulled one foot of wire on the project” and had not installed a single fire alarm device. This testimony was unrebutted.
Defendant’s vice-president received a letter from plaintiffs treasurer on or about June 3 stating that plaintiff was running a $76,864.53 deficit on the project—$129,649.31 with plaintiffs profit margin factored in—and that plaintiff believed that “the project is overstaffed” and “suffering from [a] lack of optimal productivity.” He also stated that plaintiff was “not able to absorb any further losses” and requested a meeting to discuss the project.
Defendant’s vice-president testified that after receiving the letter, he spoke with plaintiffs treasurer and explained that defendant was also losing money on the project. He also explained that the parties had agreed that defendant would augment plaintiffs work force to advance the work. With respect to the letter dated June 8, 2004 in which defendant’s vice-president informed plaintiff that it was not entitled to any money on its requisition for the third installment payment (and actually owed defendant $70,737.34), defendant’s vice-president noted that he never received any protest, written or otherwise, from plaintiff.
Defendant’s vice-president testified that on June 9 he was notified by defendant’s foreman on the job site that plaintiff had demobilized its operations and abandoned the project. He further testified that he never received notice from plaintiff of *479 its decision to abandon the project. Although defendant’s vice-president sent the above-noted letter of June 11 to plaintiff’s president, stating that plaintiff was in breach of the purchase order and was responsible for the cost of completing the work, plaintiff never responded to the letter. Defendant’s foreman inspected the work plaintiff performed and reported that only 60 to 65% of the conduit had been installed on the first floor, no wire had been pulled through the conduit, no fire alarm devices had been installed, and only 30% of plaintiffs work under the purchase order had been completed by plaintiffs electricians. Moreover, the only work done on the second floor had been performed by defendant’s electricians. As a result of plaintiffs abandonment of the project, defendant was constrained to finish the fire alarm system work.
In its charge to the jury, the court instructed that pursuant to a stipulation, it was agreed that the purchase order was the contract between the parties.[4] The court noted that plaintiffs claim was that defendant breached the contract by failing to make payments in accordance with its terms. The court further instructed the jury that to prevail on its breach of contract claim, plaintiff was required to prove, among other things, that: (1) plaintiff substantially performed its obligations under the purchase order or was excused from further performance by the conduct of defendant; and (2) defendant breached the contract by failing to make payments required by the purchase order. Conversely, defendant’s claim was that plaintiff breached the contract by both failing to timely progress with the work and abandoning the project. To prevail on its counterclaim, the court instructed, defendant was required to prove that: (1) it substantially performed its obligations under the purchase order or was excused from further performance by the conduct of plaintiff; and (2) plaintiff breached the contract by failing to advance properly the work as required by the purchase order. Thus, to determine which party breached the contract, the jury had to determine: (1) when plaintiff was entitled to payment *480 under the purchase order; (2) whether the parties agreed that defendant would augment plaintiff’s work force and deduct from plaintiffs payments the costs of the additional labor; and (3) whether plaintiff was prevented from progressing with and completing its work. The jury necessarily (albeit implicitly) found in favor of plaintiff on each of these points, concluding that defendant breached the contract and awarding plaintiff $243,341.99. A judgment was subsequently entered on the verdict.
On its appeal from the judgment, defendant argues, among other things, that the verdict was against the weight of the evidence and that the action must therefore be retried. For the reasons that follow, I agree.[5]
CPLR 4404 (a) provides, in pertinent part, that “the court may set aside a verdict or any judgment entered thereon and . . . may order a new trial of a cause of action or separable issue where the verdict is contrary to the weight of the evidence.” As the Court of Appeals stated in Cohen v Hallmark Cards (45 NY2d 493, 498 [1978]): “In reviewing a judgment of Supreme Court, the Appellate Division has the power to determine whether a particular factual question was correctly resolved by the trier of facts. If the original fact determination was made by a jury, as in this case, and the Appellate Division concludes that the jury has made erroneous factual findings, the court is required to order a new trial, since it does not have the power to make new findings of fact in a jury case . . . [T]he determination that a factual finding was against the preponderance of the evidence is itself a factual determination based on the reviewing court’s conclusion that the original trier of fact has incorrectly assessed the evidence” (citation omitted). The question of whether a verdict is against the weight of the evidence is discretion-laden, and the critical inquiry is whether the verdict rested on a fair interpretation of the evidence (see McDermott v Coffee Beanery, Ltd., 9 AD3d 195, 206 [2004]). The judge’s common sense reaction to the evidence (Siegel, NY Prac § 406, at 687 [4th ed]), informed by the judge’s professional judgment (see id. at 688; Annunziata v Colasanti, 126 AD2d 75, 80 [1987], citing Nicastro v Park, 113 AD2d 129, 135 [1985]), is the practical test employed to determine whether a verdict rested on a fair interpretation of the evidence. Notably, a court’s discretion *481 to set aside a verdict as against the weight of the evidence “ ‘is at its broadest when it appears that the unsuccessful litigant’s evidentiary position was particularly strong compared to that of the victor’ ” (Annunziata, 126 AD2d at 80, quoting Nicastro, 113 AD2d at 136).
The parties stipulated that the purchase order was a binding contract, but they disagreed as to when plaintiff was entitled to receive payment under the contract. The evidence supports strongly defendant’s interpretation of the contract. Plaintiff s president testified that he believed that plaintiff would be paid the installment payments in full on the dates listed in the purchase order regardless of the amount of work plaintiff had completed. He also testified that defendant guaranteed plaintiff it would make a profit on the project. The purchase order, though, stated that the payment schedule was “subject to change” and that the ie[f]ailure to deliver materials or services in a timely fashion will release contractor from any obligation to purchase implied by this order” (emphasis added). Thus, the purchase order is inconsistent with the position of plaintiffs president but is consonant with defendant’s vice-president’s testimony that the purchase order was a “lump-sum” contract pursuant to which plaintiff would submit requisitions reflecting the amount of work it had performed and defendant would issue installment payments based on the amount of work completed.
Plaintiffs conduct also suggests that defendant’s interpretation of the purchase order is correct. After all, plaintiff provided its certified payroll records to defendant as it was processing the installment payments. If plaintiff were entitled to the installment payments regardless of the amount of work it had performed, resort to those records to calculate the payments would have been unnecessary. Moreover, plaintiffs president’s testimony that plaintiff was to be paid the installment payments regardless of how much work (if any) it had performed and that defendant guaranteed plaintiff it would make a profit on the project not only strains credulity, it is at odds with the consistent and plausible testimony of defendant’s vice-president. Finally, as discussed above, plaintiffs president’s testimony is contradicted by the express terms of the purchase order.
The parties also dispute whether they agreed, after plaintiff began working at the site, that defendant would augment plaintiffs work force and deduct the costs associated with doing so from plaintiffs installment payments. Plaintiffs president testified that no such agreement was reached. Defendant’s vice-president, however, provided detailed testimony establishing *482 that plaintiff was not assigning sufficient manpower to the job site and supporting defendant’s claim that the agreement was reached, testimony that was corroborated by extensive documentary evidence. Defendant’s vice-president’s letters to plaintiff of March 31, May 5, May 6, and June 8, the executed partial waivers and release of lien forms and plaintiffs own invoice for the second installment payment, individually and collectively, provide compelling support for defendant’s claim that the parties agreed to defendant’s augmentation of plaintiffs work force and deduction of the costs associated therewith from plaintiffs installment payments.
Defendant’s vice-president testified that he never received any written or verbal communications from plaintiff protesting the arrangement—not even after plaintiff received defendant’s letters of May 5 and 6 and June 8 deducting substantial sums from plaintiffs requisitions for the second and third payments. Plaintiffs president acknowledged that plaintiff never protested in writing either the augmentation of its work force or the resulting substantial reductions from the installment payments. In short, plaintiff produced no evidence corroborating its president’s testimony that no manpower augmentation agreement was reached. Given the amount of money defendant was deducting from the installment payments, it borders on the incredible that plaintiff would not have submitted a written protest if there were no agreement that defendant would augment plaintiffs work force.[6]
Plaintiff claims that it was prevented from progressing with and completing the work. This claim had two aspects. First, that other trades were working on the job site and hindered plaintiffs ability to perform its work. Second, that plaintiff required additional information to plan and perform its work, information that was never provided. The only evidence, however, that plaintiff offered to support this claim was the conclusory, undetailed and uncorroborated testimony of its president. Although plaintiffs president testified that other trades hindered plaintiff’s ability to perform its work and that he needed, but never received, additional information regarding the project, he acknowledged that he never sent a single written *483 request to defendant for further information about the project and never protested that the plans or specifications were incomplete or inaccurate. In fact, the documentary evidence belies plaintiffs claim. Both plaintiffs proposal to defendant for the project—“We are pleased to submit our proposal for the . . . project consistent with the specifications and . . . shop drawings and the [MTA] drawings . . . provided”—and the purchase order—“Project is as per plans and specifications”—make plain that plaintiffs work was based on plans and specifications provided to plaintiff before it executed the purchase order.
Defendant’s vice-president testified that other trades would be on the site when plaintiff began its work but were simply “standard trades” that are present on most construction projects. Of course, that other trades were on the job site working in proximity to plaintiff’s employees is unremarkable—the construction of the facility was a “fast track” project, which plaintiff clearly knew when it submitted its proposal to defendant and executed the purchase order. Defendant’s vice-president also testified that all drawings and specifications for plaintiffs work were complete before the purchase order was executed, and confirmed that no written requests for information were sent by plaintiff to defendant.
At bottom, on each material factual question presented at trial with respect to which party breached the contract—when plaintiff was entitled to payment under the purchase order, whether the parties agreed that defendant would augment plaintiff’s work force and deduct from plaintiffs payments the costs of the additional labor, and whether plaintiff was prevented from progressing with and completing its work—defendant’s vice-president’s testimony was consistent, in accordance with common sense, and supported firmly by the documentary evidence in the record. By contrast, the relevant testimony of plaintiff’s president was bereft of detail, refuted by the documentary evidence, and, in important respects, at odds with common sense. In short, the jury’s verdict in favor of plaintiff and against defendant is “completely at odds with any fair interpretation of the evidence” (Sepulveda v Aviles, 308 AD2d 1, 9 [2003]). Unfortunately, the majority simply defers to the jury’s “credibility determinations.” It fails to heed the obligation to scrutinize the evidence adduced at trial and the principle that our discretion to set aside a verdict as against the weight of the evidence is, as noted, “ ‘at its broadest when it appears that the unsuccessful litigant’s evidentiary position was particularly strong compared to that of the victor’ ” (Annunziata, 126 AD2d at 80, quoting Nicastro, 113 AD2d at 136).
*484 Even assuming that the jury’s verdict on the issue of breach was not against the weight of the evidence, a new trial would be necessary on the issue of damages. Plaintiff sought $243,341.99, the difference between the amount of money it spent on the project ($375,600.65) and the amount it was paid by defendant ($174,491.57) plus its “allowance for overhead and profit” ($42,232.91). Defendant asserted, however, that any award of damages to plaintiff should reflect that plaintiffs treasurer executed waivers when accepting its first and second payments from defendant, precluding plaintiff from recovering any damages sustained during the periods covered by the waivers. The first waiver covered the period from the date plaintiff began working on the project through March 3, 2004, and the second waiver covered the period from March 4, 2004 through March 31, 2004.[7]
Plaintiff asserted that the waivers were unenforceable because defendant procured them through economic duress. The only evidence plaintiff adduced in support of this assertion was the testimony of its president. He testified that plaintiffs treasurer executed the waivers because plaintiff needed the money and the money would only be released to plaintiff if it executed the waivers. As plaintiffs president put it, “I had no choice. We had men working on the job ... we needed to get paid, and we needed to pay the union and pay the workers, and other expenses that we had.” Later in his testimony, plaintiffs president stated that plaintiffs treasurer was “forced” to sign the waivers because “I needed to get my money” since “I didn’t have any more money to invest in the job.” Plaintiff offered no other evidence on this point.
This testimony was patently insufficient to establish that defendant compelled plaintiff to execute the waivers by means of a wrongful threat that precluded plaintiff from exercising free will (see Stewart M. Muller Constr. Co. v New York Tel. Co., 40 NY2d 955, 956 [1976]). Plaintiffs president’s testimony simply does not support the conclusion that defendant threatened to breach the agreement by refusing to pay plaintiff money owed to it under the agreement unless plaintiff agreed to execute the waivers (see 805 Third Ave. Co. v M.W. Realty Assoc., 58 NY2d 447, 451 [1983]). Rather, the evidence demonstrates that plaintiff signed the waivers to obtain payments from defendant *485 and that plaintiff did not protest the amounts of those payments at the time the waivers were executed. Plaintiff itself recognized that it was not entitled to the amount listed in the agreement for the second installment payment but to the amount defendant offered plaintiff; plaintiff’s own invoice for the second installment payment reflects that plaintiff deducted from the amount it requested defendant’s “labor costs” and “expense costs.” That plaintiffs president was under financial pressure to meet plaintiffs payroll and other obligations is simply insufficient to support the jury’s implicit finding that defendant subjected plaintiff to economic duress (see Gubitz v Security Mut. Life Ins. Co. of N.Y., 262 AD2d 451 [1999]; Bethlehem Steel Corp. v Solow, 63 AD2d 611, 611 [1978], appeal dismissed 45 NY2d 837 [1978], citing Grubel v Union Mut. Life Ins. Co., 54 AD2d 686 [1976]). Because the jury awarded plaintiff the full amount of damages plaintiff sought and some of those damages were sustained during the periods covered by the waivers, a new trial on damages would be necessary in any event.
Accordingly, I would reverse the judgment and remand for a new trial. I need not and do not address defendant’s remaining argument that a new trial must be ordered because the conduct of plaintiffs president and plaintiffs attorney prejudiced the jury.

 The dissent acknowledges this fact, stating, “The requisition . . . merely demanded the payment specified in the purchase order.”

. The second installment payment was listed in the purchase order as $237,500, but plaintiff requested $250,000. It is unclear why plaintiff requested $12,500 more than was called for in the purchase order for the second installment payment.

. The check defendant sent to plaintiff was for $94,491.57, $5,292.50 less than the amount defendant told plaintiff it would receive on the second installment payment. The partial waiver and release of lien indicated that plaintiff received $99,784.07. Plaintiffs treasurer noted the discrepancy on the bottom of the executed waiver form.

. Defendant’s vice-president noted that the conduit called for in the project’s specifications was particularly difficult to install. He testified that the conduit was not the “traditional metal tubing” that was used on most projects but rather a “galvanized ridged conduit. . . [that is] more difficult to install because there is cutting and threading [involved].”

. Plaintiff seems to argue in its brief that the judgment, which was the product of a jury’s verdict on a claim and counterclaim for breach of contract, can be affirmed because plaintiff was entitled to recover in quantum meruit. That claim was not before the jury on the verdict sheet; it considered only the competing breach of contract claims. In any event, plaintiff stipulated that the purchase order was an enforceable contract. Thus, any argument based on quantum meruit is patently without merit (Cox v NAP Constr. Co., Inc., 10 NY3d 592, 607 [2008] [“a party may not recover in quantum meruit or unjust enrichment where the parties have entered into a contract that governs the subject matter”]; see IDT Corp. v Morgan Stanley Dean Witter & Co., 12 NY3d 132, 142 [2009]).

. Defendant does not assert that the verdict was not supported by legally sufficient evidence and that the complaint should be dismissed. Thus, the majority’s discussion of the law regarding the legal sufficiency of evidence and its repeated observation that the verdict is supported by legally sufficient evidence are irrelevant.

. The majority faults defendant for not calling one of its employees, Evans, as a witness to rebut plaintiff’s president’s testimony that he did not protest in writing to defendant because he was in communication with Evans, with whom plaintiffs president had previously worked. That defendant did not call Evans is not remarkable. Defendant’s vice-president’s detailed testimony was corroborated by the letters he sent to plaintiff. It was plaintiffs president’s testimony that was not corroborated by any evidence. Thus, the appropriate question to ask is why plaintiff did not call Evans.

. The court charged the jury: “If you decide [plaintiff] is entitled to recover from [defendant], you should consider whether in executing the partial waivers and releases of liens [plaintiff] waives and releases its claims, claims through the time period of the waivers which is from the beginning of [plaintiffs] performance to March 31, 2004.”